Lori Rifkin, Esq. [S.B. # 244081]
Sairah Budhwani, Esq. [S.B. # 327996)
RIFKIN LAW OFFICE
3630 High St. #18917
Oakland, CA 94619
Telephone: (510) 414-4132
Emails: lrifkin@rifkinlawoffice.com
            sbudhwani@rifkinlawoffice.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| ESTATE OF RAFAEL RAMIREZ LARA, deceased, by and through PATRICIA RAMIREZ; PATRICIA RAMIREZ; RAFAEL RAMIREZ; and JENNIFER RAMIREZ,<br><br>    Plaintiffs,<br><br>v.<br><br>COUNTY OF MONTEREY; SHERIFF STEVE BERNAL, in his individual and official capacity; JAMES BASS, in his individual and official capacity; JOHNATHAN THORNBURG, in his individual and official capacity; RAY TONGOL, in his individual and official capacity; J. TEJEDA, in his individual and official capacity; WELLPATH; KIP HALLMAN; JORGE DOMINICIS; THOMAS PANGBURN; PAUL FRANCISCO, and DOES 1 and 2,<br><br>    Defendants. | Case No.:<br><br>**COMPLAINT FOR DAMAGES**<br><br>1. **Failure to Provide Mental Health Treatment in Violation of 14th and 8th Amendments (42 U.S.C. § 1983);**<br>2. **Failure to Protect from Harm in Violation of 14th and 8th Amendments (42 U.S.C. § 1983);**<br>3. **Deprivation of Substantive Due Process in Violation of 1st & 14th Amendments (42 U.S.C. § 1983);**<br>4. **Wrongful Death.**<br><br>**JURY TRIAL DEMANDED** |

COMPLAINT FOR DAMAGES

**INTRODUCTION**

1.     Rafael Ramirez Lara, a 57-year-old man with a history of schizophrenia who was incarcerated in Monterey County Jail ("the Jail"), died because Defendants Monterey County and its for-profit health care provider, Wellpath, failed to provide him minimally adequate health care. According to the County's own Coroner, Mr. Lara died in a pool of his own vomit after compulsively drinking an excessive amount of water—he drowned to death—as a result of untreated schizophrenia. Mr. Lara's horrific death was preventable had Defendants fulfilled their basic obligations as custodians of Mr. Lara.

2.     Defendants have been on notice for well over a decade about the inadequacies of their policies, procedures, and practices, and particularly, medical and mental health system, that resulted in Mr. Lara's death. In 2015, a federal court found "significant evidence that Defendants' policies and practices constitute deliberate indifference to Plaintiffs' serious medical needs, particularly for the mentally ill." *Hernandez v. County of Monterey*, 110 F.Supp.3d 929, 946 (N.D. Cal. 2015). Despite entering a settlement agreement in the *Hernandez* case in which they promised to implement desperately needed improvements, Defendants have failed to remediate known deficiencies in their healthcare system, resulting in Mr. Lara's death—yet another preventable tragedy in their custody.

**JURISDICTION**

3.     This Complaint seeks damages for violations of the civil rights, privileges, and immunities guaranteed by the First, Eighth, and Fourteenth Amendments of the United States Constitution, pursuant to 42 U.S.C. §§ 1983 and 1988, and for violations of California state law.

4.     This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. §§ 1331 and 1343.

5.     This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367, because the claims form part of the same case or controversy arising under the United States Constitution and federal law.

**VENUE**

6.     Plaintiffs' claims arose in the County of Monterey, California. Venue therefore lies in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2).

7.     Rule 3 of the Federal Rules of Civil Procedure and Local Rule 3-2(e) authorizes assignment to this division because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the counties served by this division.

**PARTIES**

8.     Plaintiff ESTATE OF RAFAEL RAMIREZ LARA brings this action by and through PATRICIA RAMIREZ pursuant to California Code of Civil Procedure § 377.60. Mr. Lara died from acute water intoxication (psychogenic polydipsia) resulting from untreated schizophrenia in Monterey County Jail in Salinas, California on December 22, 2019. Mr. Lara was a monolingual Spanish speaker with a rudimentary understanding of English. From September 1, 2019 to December 5, 2019, Mr. Lara was incarcerated in the Jail as a pre-trial detainee. From December 5, 2019 to his death on December 22, 2019, Mr. Lara was incarcerated in the Jail on post-conviction status after entering a plea. At the time of his death, Mr. Lara was 57 years old and was housed in the J-pod unit of the Jail. Plaintiff ESTATE brings claims based on violations of the Fourteenth and Eighth Amendments and California state law.

9.     Plaintiff PATRICIA RAMIREZ is Mr. Lara's daughter and resides in Gonzales, California. Ms. Ramirez is 31 years old. She is suing individually for violations under the First and Fourteenth Amendments and California state law.

10.     Plaintiff RAFAEL RAMIREZ is Mr. Lara's son and resides in Gonzales, California. Mr. Ramirez is 26 years old. He is suing individually for violations under the First and Fourteenth Amendments and California state law.

11.     Plaintiff JENNIFER RAMIREZ is Mr. Lara's daughter and resides in Gonzales, California. Ms. Ramirez is 21 years old. She is suing individually for violations under the First and Fourteenth Amendments and California state law.

12.     Defendant COUNTY OF MONTEREY is a public entity, duly organized and existing under the laws of the State of California. Under its authority, and through the Monterey County Sheriff's office ("MCSO"), Defendant County of Monterey operates and manages Monterey County Jail and is and was at all relevant times mentioned herein responsible for the actions and/or inactions and the policies, procedures, and practices/customs of MCSO and Monterey County Jail, and each entity's respective employees and/or agents. COUNTY OF MONTEREY, through MCSO, is and was responsible for ensuring the safety of all persons incarcerated in the Jail and providing them appropriate medical and mental health treatment.

13.     Defendant STEVE BERNAL is and, since December 31, 2014, has been the Sheriff-Coroner of the County of Monterey, the highest position in MCSO. As Sheriff, Bernal is and was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all MCSO employees and/or agents, including the Corrections Bureau. Bernal is and was charged by law with oversight and administration of the Monterey County Jail, including ensuring the safety of the inmates housed therein. Bernal also is and was responsible for the promulgation of the policies and procedures and allowance of the practices/customs pursuant to which the actions and omissions alleged herein were committed. Defendant Bernal is sued in his individual and official capacities.

14.     Defendant JAMES BASS is Chief Deputy of the MCSO Corrections Bureau. Previously, he was a Captain and Commander in the MCSO Corrections Bureau, which are also high-level supervisory positions. At all times relevant herein, Bass's responsibilities included assisting the Sheriff-Coroner with oversight and administration of the Jail, and overseeing Jail operations, including ensuring the safety of the inmates housed therein. Bass has been specifically responsible for working on issues related to provision of health care to people incarcerated at the Jail, including but not limited to issues related to the *Hernandez* class action lawsuit. Bass was and is responsible for supervision of MCSO employees and/or agents at the Jail, and for the promulgation of the policies and procedures and allowance of the practices/customs pursuant to which the acts

and omissions alleged herein were committed. Defendant Bass is sued in his individual and official capacities.

15.     Defendant JOHN THORNBURG is Chief Deputy of the MCSO Enforcement Bureau, and at all times relevant herein was either a Captain or Chief Deputy, which are also high-level supervisory positions in MCSO with responsibilities that include oversight and enforcement of MCSO policies and procedures at the Jail and review and/or allowance of the practices/customs pursuant to which the actions and omissions alleged herein were committed. Defendant Thornburg is sued in his individual and official capacities.

16.     Defendant RAY TONGOL is a high-level supervisor in MCSO who was Jail Operations Commander or other high-level supervisor at the Jail during all times relevant herein. His responsibilities included assisting the Sheriff-Coroner with oversight and administration of the Jail, including supervision of MCSO employees and/or agents at the Jail, promulgation of policies and procedures for Jail operations, and review and/or allowance of the practices/customs pursuant to which the actions and omissions alleged herein were committed. Defendant Tongol is sued in his individual and official capacities.

17.     Defendant J. TEJEDA was at all times relevant herein an MCSO Deputy. As a Deputy at the Jail, Tejeda was responsible for carrying out MCSO policies and procedures and for ensuring the safety of people incarcerated at the Jail. Tejeda was working as a Main Jail Floor Deputy between the hours of 7:20 a.m. – 3:20 p.m. on December 22, 2019, the day of Mr. Lara's death. His work duties that day included ensuring the safety, heath, and welfare of people in housed the J-pod of the Jail, including Mr. Lara. Tejeda was responsible for performing health and welfare checks of Mr. Lara at least during the 11:00 a.m. and 12:00 p.m. hours on December 22, 2019. Defendant Tejeda is sued in his individual capacity.

18.     Defendant WELLPATH is a corporation headquartered in Nashville, Tennessee. Wellpath is one of the nation's largest for-profit correctional health care providers, currently servicing approximately 394 county jails and community facilities

and more than 140 state and federal prisons in approximately 36 states. The County of Monterey contracts with Wellpath to provide medical, mental health, and dental services for the Jail. Prior to 2018, Monterey County contracted with California Forensic Medical Group ("CFMG"), which was owned by the private equity firm HIG Capital as part of their portfolio of Correctional Medical Group Companies ("CMGC"). In 2018, facilitated by $610 million in Wall Street loans, HIG Capital merged CMGC with another correctional healthcare acquisition, Correct Care Solutions, and rebranded as Wellpath. The County has contracted with Wellpath and its precursor, CFMG, to provide health care at its Jail for approximately 37 years, since 1984. *Hernandez*, 110 F.Supp.3d at 936. Wellpath was responsible for the provision of health services in the Jail at all times relevant herein.

19.     Defendant KIP HALLMAN is, and was at all relevant times herein, President of Wellpath. His responsibilities included the promulgation of the policies and procedures and allowance of the practices/customs pursuant to which the acts and omissions alleged herein were committed. Hallman had knowledge of deficiencies in policies, procedures, and practices regarding provision of health care at Monterey County Jail and failed to take reasonable and adequate measures to correct these failures prior to Mr. Lara's death.

20.     Defendant JORGE DOMINICIS is, and was at all relevant times herein, Chief Executive Officer of Wellpath. His responsibilities include managing overall operations and resources, making major corporate decisions, and driving corporate strategy. Dominicis had knowledge of deficiencies in policies, procedures, and practices regarding provision of health care at Monterey County Jail and failed to take reasonable and adequate measures to correct these failures prior to Mr. Lara's death.

21.     Defendant THOMAS PANGBURN, M.D. is the Chief Clinical Officer for Wellpath and has been in this position since at least fall of 2019. His responsibilities include communicating between medical staff and administration and ensuring appropriate care to all patients. Pangburn had knowledge of deficiencies in policies, procedures, and practices regarding provision of health care at Monterey County Jail and

had failed to take reasonable and adequate measures to correct these failures prior to Mr. Lara's death.

22.     Defendant PAUL FRANCISCO, M.D was at all relevant times mentioned herein, a psychiatrist responsible for providing treatment to persons incarcerated at Monterey County Jail, including Mr. Lara. Francisco failed to provide adequate treatment to Mr. Lara, including but not limited to failing to adequately assess and treat Mr. Lara's mental health on December 1, 2019 or take other action to ensure that Mr. Lara's mental health was appropriately assessed and treated.

23.     Defendant DOE 1 is the Chief Clinical Officer for Wellpath prior to October 2019. DOE 1's responsibilities include communicating between medical staff and administration and ensuring appropriate care to all patients. At the times relevant herein, DOE had knowledge of deficiencies in policies, procedures, and practices regarding provision of health care at Monterey County Jail and had failed to take reasonable and adequate measures to correct these failures prior to Mr. Lara's death.  At the present time, the identity of Doe 1 is unknown to Plaintiffs. Plaintiffs will substitute the true name of Doe 1 when Plaintiff is able to ascertain their identity through discovery.

24.     Defendant DOE 2 is the supervisor of Wellpath's provision of mental health services at Monterey County Jail. This is the person responsible for ensuring that Wellpath providers at the Jail complete adequate and timely mental health assessments and referrals of patients, and provide appropriate mental health treatment. At the times relevant herein, DOE 2 failed to adequately train, supervise, and monitor mental health providers at the Jail to ensure provision of appropriate mental health treatment to Mr. Lara. At the present time, the identity of Doe 2 is unknown to Plaintiffs. Plaintiffs will substitute the true name of Doe 2 when Plaintiff is able to ascertain their identity through discovery.

25.     At all times relevant herein, Defendants were acting under color of state law as direct County employees and/or agents of the County by contract.

1

2

## EXHAUSTION OF PRE-LAWSUIT PROCEDURES
## FOR STATE LAW CLAIMS

3       26.     Plaintiffs filed a notice of governmental tort claims with Defendant County

4   of Monterey on behalf of the Estate of Rafael Ramirez Lara, Patricia Ramirez, Rafael

5   Ramirez, and Jennifer Ramirez on June 19, 2020. The County of Monterey never issued a

6   decision on the notice of claims. Plaintiffs have duly exhausted pre-lawsuit procedures for

7   their state law claim.

8                              **FACTUAL ALLEGTIONS**

9   **I.   Defendants' Longstanding Failure to Provide Adequate Health Care at**

10       **Monterey County Jail**

11      27.     Defendants County of Monterey and Wellpath have a longstanding history

12  and practice of failing to provide adequate medical care to persons in their custody at

13  Monterey County Jail. Their ongoing refusal to provide minimally adequate treatment

14  constitutes deliberate indifference and resulted in Mr. Lara's untimely death.

15      28.     Defendant County of Monterey also has a longstanding history and practice

16  of failing to ensure that safety, health, and welfare checks are adequately and correctly

17  performed by officers at the Jail in order to effect their intended purpose of protecting

18  people incarcerated at the Jail from harm.

19      29.     Defendants have been on notice that their provision of medical care to

20  inmates is inadequate and results in substantial risk of serious harm since at least 2007,

21  when the County hired an outside consulting firm to perform a needs assessment for the

22  Jail. This assessment, as well as a second needs assessment completed in 2011, found that

23  medical and mental health treatment at the Jail were inadequate.

24      30.     From 2014-2017, the Monterey County Civil Grand Jury investigated the

25  condition and management of the Monterey County Jail and found consistent problems

26  that resulted in risk of serious harm to people in the Jail. The failures documented by the

27  Grand Jury included "frequently missed or skipped" safety checks of inmates and "mental

28  health issues [ ] still not being addressed."

COMPLAINT FOR DAMAGES                    -7-

31.     In April 2015, the District Court presiding over *Hernandez v. County of Monterey, et al,* a class action lawsuit against Monterey County and CFMG for, *inter alia*, failing to provide minimally adequate medical and mental health care at the Jail—found substantial evidence that the Jail's system of medical and mental health care was Constitutionally deficient, and subjected people with existing medical and mental health conditions in its custody at risk of serious harm, including self-harm. These hazardous policies and practices included, *inter alia*, incomplete intake health screenings, inadequate care scheduling, insufficient interpretation services, lack in continuity of prescription medications, and a deficient process for identifying and treating drug use and alcohol withdrawal. The Court stated that the Jail's systemic failures in providing psychiatric medication caused inmates with mental illness to decompensate, leading to additional harm and suffering. The *Hernandez* Court issued a preliminary injunction ordering the County and CFMG (now Wellpath) to file a plan to remedy these violations.

32.     On May 11, 2015, the parties in *Hernandez* filed a settlement agreement that required the County and CFMG to create Implementation Plans for improvements to the Jail's intake screening process, system for medication continuity, custody and clinical staffing, and medical and mental health care.

33.     In April 2016, the County and CFMG submitted Implementation Plans to the District Court that included revisions to their procedures for, *inter alia*, intake screenings, medication continuity and administration, interpretation services, access to health care and mental health services, treatment of alcohol and drug withdrawal, psychiatric monitoring, suicide prevention, recordkeeping, and staffing.

34.     Pursuant to the Implementation Plans Defendants filed with the Court, the Jail's new policies would specifically include the following elements, among others:

   ***Interpretation***. Interpretation is to be used whenever necessary.

   ***Mental Health Screening During Intake***.

   -     All new inmates are to be observed and queried for signs and history of mental illness, including suicidal behavior/ideations and use of psychiatric

medication. Inmates must also be queried about drug/alcohol use and their emotional response to incarceration.

- Staff must request treatment records indicating current and recent medications, hospitalizations, emergency room visits, and outpatient services.

- Presence or history of mental illness requires further evaluation by mental health services staff.

***Continuation of Medications Begun Prior to Incarceration.***

- Information about medications that the inmate was taking prior to incarceration shall be obtained from their physician.

- Prior treatment records shall inform current medication plan.

***Monitoring***

- Patients with chronic health conditions shall be seen by the psychiatrist at least every ninety days if condition is stable or more frequently if condition is unstable while in custody.

- At minimum, the psychiatric provider will assess the patient's diagnosis, degree of control, and history, including compliance with therapeutic regimen.

35.     The *Hernandez* case remains ongoing. There is no indication based on the public record in that case that provision of health care at the Jail now meets even minimum standards of care, or that the deficiencies specifically identified in that case have been adequately remediated.

36.     In addition to the findings of the Jail needs assessments, the Grand Jury, and the *Hernandez* Court, Defendants have been on notice of their Constitutionally deficient provision of health care and safety checks at the Jail as a result of the disproportionately high death rate at the Jail compared to other Jails in California, and nationally.

37.     Despite Defendants' extensive knowledge of the inadequate health care at the Jail, the deficiencies in safety, health, and welfare checks conducted by officers at the Jail,

and the attendant risks of serious harm to people housed there, as of 2019, Defendants continued to refuse to fully remediate these deficiencies.

## II.   Defendants' Knowledge of Mr. Lara's Serious Health and Language Interpretation Needs

38.     Between April 2018 and the time of his death on December 22, 2019, Mr. Lara was arrested and incarcerated three times as his mental state deteriorated due to schizophrenia. After each arrest, Mr. Lara was booked in the Monterey County Jail, and was incarcerated in the Jail for a total of approximately 8 months out of this 20-month period.

39.     Jail records during this period note that Mr. Lara required a Spanish translator.

40.     In June 2018, while incarcerated at the Jail, Mr. Lara engaged in multiple self-harming activities, including repeatedly striking his head against the cell wall, and fracturing his right hand by punching a glass window. Mr. Lara was brought to Natividad Medical Center for his injuries, where he informed medical staff that for the prior three days, he had been hearing voices telling him that his family was in danger of violence and kidnapping, and he had been having paranoid thoughts of people talking about him in jail. Natividad medical staff's notes from this visit remark on his "bizarre" behavior and note a history of schizophrenia. A Natividad doctor prescribed him Haldol, an anti-psychotic medication.

41.     Mr. Lara's mental health symptoms improved on Haldol. However, after the prescription from Natividad expired, it was discontinued. On information and belief, Mr. Lara was not evaluated by a psychiatrist at the Jail despite his symptoms of hallucinations, paranoia, and self-harm.

42.     On July 20, 2018, while again unmedicated for auditory hallucinations and paranoia, Mr. Lara told deputies that he planned to grab a deputy's gun to shoot himself and made movements to do so. Mr. Lara expressed to medical staff that he was worried about danger to his family and that he continued to hear voices that shook him awake at

night. Jail staff put Mr. Lara on Suicide Watch for one day. After his release from suicide watch, Mr. Lara remained unmedicated for almost two weeks until a Jail psychiatrist prescribed him Haldol on or around August 2, 2018. Mr. Lara then took Haldol daily until his release from the Jail on August 30, 2018. Jail records indicate that he never refused the medication during this time period.

43.    Sometime during August 2019, Mr. Lara was sleeping in a public park because he said he did not feel safe at his own residence. During the week of August 25, 2019, Mr. Lara called the police on at least two separate days and reported that he was worried that his ex-wife and adult children were in danger at their home. Mr. Lara's family was concerned he was experiencing paranoia or other symptoms of mental illness.

44.    In the early morning of August 31, 2019, Mr. Lara came to the house where his ex-wife and adult children lived, expressing paranoid and delusional thoughts that they were in danger. His clothes were dirty and torn. He surveyed the entire home one room at a time in a panic, and asked his family repeatedly if they were okay. Mr. Lara's family had never before witnessed this type of bizarre behavior from him, and they realized that he appeared to be experiencing a mental health crisis. His family believed based on his paranoia and unusual statements that he was disconnected from reality. They tried to calm him down and convince him to take a shower and stay at the house. However, he refused, so they packed him a backpack with fresh clothes to take with him and made him a meal. Right as he was about to begin eating, he suddenly became upset again and stormed out of the house. Mr. Lara's son, Plaintiff Rafael Ramirez, followed him and pleaded that he at least take the backpack, but Mr. Lara refused.

45.    To try to find help for Mr. Lara, his daughter, Plaintiff Patricia Ramirez, contacted the Gonzales Police Department for assistance that same day. She informed Gonzales Police that Mr. Lara had been paranoid about the family's safety for no apparent reason that whole week, had called the police to check on them, and had come to their house himself to do the same. She told them that he had not been making sense and was behaving unlike himself. Per the advice of the Gonzales Police, Mr. Lara's family planned

to have Mr. Lara placed under 72-hour psychiatric hospitalization as designated in Cal. Welf. & Inst. Code § 5150 the next time they saw him. However, Mr. Lara was arrested the next day, September 1, 2019, before they had a chance to carry out this plan.

46.    Following Mr. Lara's arrest on September 1, he was transferred to the custody of Monterey County Sheriff's Office and booked at the Monterey County Jail.

47.    Despite the fact that Mr. Lara was a monolingual Spanish speaker, Jail staff conducted his initial health screening without Spanish interpretation, in violation of the policy Defendants had agreed to implement pursuant to their own Implementation Plans filed in *Hernandez*.

48.    Following the initial health screening, despite the Jail's own medical records documenting Mr. Lara's history of schizophrenia (including hallucinations, delusions, and paranoia), self-harm, and suicidal ideation, as well as the prescription of Haldol to treat his mental illness, Jail staff did not refer Mr. Lara to a psychiatrist or other mental health services. Additionally, although Mr. Lara indicated that he had a history of alcohol withdrawal and had consumed alcohol the day of his arrest, he was also not referred for alcohol detoxification/withdrawal treatment.

49.    Two days later, on or around September 3, 2019, Plaintiff Patricia Ramirez called the Jail to inform them of the paranoid and delusional behavior the family had witnessed from Mr. Lara a few days prior. Ms. Ramirez spoke to a Jail medical staff member and explained that her father had been irrationally worried about their safety, had looked through each room of their house, and had appeared paranoid and disconnected from reality. Ms. Ramirez stated that the family had never experienced this behavior from him before, and that, per advice from the Gonzales Police Department, had planned to have him placed in 72-hour psychiatric hospitalization for his own safety but were unable to before he was arrested. Ms. Ramirez told the Jail medical staff member that Mr. Lara needed a mental health evaluation and further help because he was not well. In response, Jail staff advised Ms. Ramirez to the effect of "Mr. Lara can seek help if he wants to."

Again, Ms. Ramirez explained that Mr. Lara needed attention immediately, and that Jail officials should not wait for Mr. Lara to seek help.

50.    On September 5, 2019, a Jail therapist documented seeing Mr. Lara cell-front. On information and belief, this means that the therapist stood outside Mr. Lara's cell, where any interactions could be seen and heard by other people on the tier, including other people housed on that unit and Jail staff. The therapist's notes indicate that Mr. Lara denied even having a family and declined to speak further, at which point the session ended. No further mental health referral was made for Mr. Lara.

51.    One week later, on September 12, 2019, the same therapist again documented seeing Mr. Lara cell-front. The therapist documented that Mr. Lara was non-verbal, and that in response to the question whether he was ok, he nodded his head, and in response to the question whether he wanted to harm himself, he shook his head.

52.    Despite Mr. Lara's unusual behavior, the information from Mr. Lara's family, and the Jail's own records indicating that Mr. Lara had a history of schizophrenia, including auditory hallucinations, paranoia, delusions, and self-harm, for which he required medication, Jail staff still did not refer Mr. Lara for further mental health evaluation or even see him in a confidential setting. Rather, they left him without any further mental health contact, intervention, or medication for the next thirty days.

53.    Mr. Lara was next seen by Jail mental health staff on October 12, 2019, when a social worker documented seeing him cell-front. The social worker noted that Mr. Lara presented as paranoid and refused to leave his cell. Again, Jail staff failed to refer him for further assessment of his mental condition.

54.    On October 23, 2019, Mr. Lara got into a physical altercation with his cellmate and reported that the fight was based on his belief that the cellmate had raped him in his sleep. Mr. Lara was taken to the Jail's infirmary and then to Natividad with "blood all over his face and clothing." Natividad's records from this visit state that Mr. Lara has a "significant past medical history of paranoid schizophrenia" and that he was not receiving regular psychiatric medication in jail.

55.     Mr. Lara was discharged from Natividad back to the Jail the next day. On information and belief, the Jail still did not provide Mr. Lara with any further mental health services after this incident despite his clearly worsening mental state and report that he had been raped. Additionally, on information on belief, the Jail did not open an investigation pursuant to the Prison Rape Elimination Act about Mr. Lara's allegation.

56.     On October 25, 2019, a nurse obtaining vitals documented that Mr. Lara was non-verbal, had a blank stare, and was unable to understand or follow directions. Jail records indicate that on the same day, a deputy instructed Mr. Lara to come out of his cell for a neurological assessment, but Mr. Lara was sitting on the toilet and did not respond to any questions posed to him. Several members of medical staff observed that Mr. Lara remained on the toilet and did not respond to any questions or requests to come out.

57.     Despite repeated observations and documentation of Mr. Lara as non-verbal, refusing to leave his cell, appearing paranoid and unable to understand directions, and recently reporting that he believed he had been raped, Jail staff again did not refer him to appropriate mental health services.

58.     On October 27, 2019, Jail records reflect that custody staff had expressed concerns that Mr. Lara was not eating or accepting medical attention.

59.     On October 28, 2019, a Jail therapist documented seeing Mr. Lara cell-front after Mr. Lara refused to come out. The therapist noted that a custody officer provided Spanish translation during this cell-front interaction. The therapist documented that Mr. Lara said that he was eating and taking medication, had no concerns and was doing fine, and did not understand the concern. The therapist noted "No further follow-up recommended at this time." No further effort was documented to explore or investigate the complete discrepancy between custody staff's observations and concerns and Mr. Lara's statement. Rather, no mental health staff saw Mr. Lara for over a month after this interaction.

60.     On December 1, 2019, a Jail therapist documented meeting with Mr. Lara outside of his housing unit for the first time for a mental status examination. The therapist

documented that Mr. Lara stated that he had been hearing voices for years and that he would like to do a program for alcoholism. The therapist also noted that Mr. Lara "[s]eemed confused when answering some questions. Unclear if it's due to psychosis, language barrier or some kind of intellectual disability." Only after this first out-of-cell interaction was Mr. Lara finally referred to a psychiatrist, more than 90 days after he had been booked into the Jail.

61.     However, on December 2, 2019, Jail psychiatrist Dr. Paul Francisco documented that Mr. Lara refused to meet with him. Despite the referral notice that Mr. Lara reported hearing voices and paranoia, and Mr. Lara's documented symptoms and history of schizophrenia, Dr. Francisco does not appear to have attempted to engage further with Mr. Lara or take any steps to evaluate his mental health condition. Rather, Dr. Francisco simply marked this appointment, during which he had not spoken with Mr. Lara, as "Completed."

62.     No further attempted contact with Mr. Lara was documented by Jail mental health staff after December 2, 2019.

### III.   Mr. Lara's Death on December 22, 2019

63.     Witnesses reported to MCSO investigators that on the morning of Mr. Lara's death on December 22, 2019, sounds of him flushing his toilet over and over could be heard from the dayroom of the unit. This was reported to be unusual. It was also reported that Mr. Lara could be heard coughing and vomiting repeatedly and for an extended period of time on the morning of his death, loudly enough to be heard from outside his cell. He could also be heard persistently coughing the previous night, again loudly enough to be heard outside his cell. Mr. Lara was housed by himself in the cell.

64.     Witnesses also reported to MCSO investigators that although Mr. Lara had in the past come out of his cell during his recreation/dayroom rotation time, he not come out of his cell for a week prior to his death.

65.     Witnesses reported that there was water on the floor coming out of Mr. Lara's cell when deputies did their health and welfare check of J-pod at approximately

11:30 a.m. It appeared that the cell was flooding. However, although this was noticeable when Defendant Tejada was walking by Lara's cell during his check of J-pod, recorded as 11:27 a.m. on the Jail log, Tejeda did not enter or stop at the cell, call out to Mr. Lara, or take any other action to ensure Mr. Lara's welfare. According to one witness, Tejeda just looked at the water, stepped over it, then moved on.

66.     At approximately 12:12 p.m. on December 22, 2019, when conducting his next health and welfare check of J-pod, Defendant Tejeda found Mr. Lara face-down and unresponsive on the floor of his cell in a pool of fluid and blood. The cell was wet and smelled like vomit, and there was water observable on the floor outside the cell. Officers called for Jail medical personnel to respond and at some point Jail personnel began performing chest compressions on Mr. Lara. Mr. Lara was ultimately removed from the cell by emergency response personnel and transferred to Natividad Medical Center where he was declared dead at 12:44 p.m.

67.     The County's postmortem examination determined that Mr. Lara died as a result of Hyponatremia (hours) due to Acute Water Intoxication (hours) due to Psychogenic Polydipsia (hours) due to Schizophrenia (years). The Coroner's Report concluded that Mr. Lara's schizophrenia caused him to compulsively drink water which ultimately led to hyponatremia, a condition where a person's sodium level becomes abnormally low and which can be fatal if not treated. The Report explained, "Psychogenic polydipsia is a term for compulsive water drinking, most often associated with mental disorders, and may result in water intoxication. Water intoxication causing low sodium (hyponatremia) may be associated with nausea and vomiting, confusion, severe changes in mental state, psychotic symptoms, and can lead to seizures, coma, and death." In short, Mr. Lara untreated schizophrenia compelled him to drink a fatal amount of water.

68.     Mr. Lara died as a result of Defendants' failures to adequately treat his known mental health condition and to respond to his urgent need for medical intervention prior to his death. His death was foreseeable and preventable and resulted from

1  Defendants' failures to meet their Constitutional obligations to treat him and protect him
2  from harm.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**Deliberate Indifference to Serious Medical Needs in**

**Violation of the Fourteenth and Eighth Amendments to the Constitution of the**

**United States (Survival Action – 42 U.S.C. § 1983)**

**(Plaintiff Estate Against All Defendants)**

69.     Plaintiffs incorporate all of the above previous paragraphs as if fully set forth herein.

70.     Mr. Lara was a pre-trial detainee from September 1, 2019 to December 4, 2019. From December 5, 2019 to his death on December 22, 2019, Mr. Lara was in post-conviction status after entering a plea. His right to adequate medical treatment as a pre-trial detainee is asserted under the Fourteenth Amendment and his right to adequate medical treatment post-conviction is asserted under the Eighth Amendment.

71.     Defendants have inadequate policies, procedures, and practices to ensure provision of minimally adequate medical and mental health treatment to inmates housed at the Jail.

72.     Defendants failed to adequately supervise the provision of medical and mental health services at the Jail, violating their constitutional obligation to ensure that inmates entrusted to their care receive necessary treatment.

73.     Defendants failed to properly train and supervise custody staff regarding policies, procedures, and practices that are necessary for the provision of adequate medical and mental health care, including but not limited to conducting adequate mental health screenings, evaluations, and/or assessments, providing appropriate interpretation services during medical/mental health appointments, responding appropriately to mental health decompensation, and responding appropriately to medical and mental health emergencies.

74.     Defendants failed to promulgate and implement policies, procedures, and practices to ensure that medical staff, including mental health staff, met the standard of care when providing treatment to inmates.

75.     Defendants were on notice for years prior to the death of Mr. Lara that their provision of medical and mental health care, including their provision of interpretation services in the context of medical and mental health care, was woefully inadequate and fell far short of the minimum elements of a constitutional health care system. Defendants were on notice that their policies, procedures, and practices resulted in failure to provide necessary medical and mental health care to the inmates at the Jail, and that this failure may result in otherwise preventable death.

76.     Defendants' failure to correct their policies, procedures, and practices despite notice of significant and dangerous problems and despite agreeing to correct them pursuant to a court-monitored settlement agreement evidences deliberate indifference to the inmates in their care.

77.     Defendants were on notice of Mr. Lara's health needs and his status as a monolingual Spanish-speaker at the time of his incarceration at the Jail in 2019. Despite this knowledge, and Mr. Lara's obvious signs of psychological and emotional distress and decompensation, Defendants failed to provide necessary mental health evaluations and treatment to Mr. Lara.

78.     Defendants failed to provide Mr. Lara consistent Spanish-language interpretation so that he could meaningfully and effectively access health services while he was held at the Jail, including in a manner that provided him confidentiality from custody staff.

79.     Defendants failed to provide perform appropriate assessments or evaluations of Mr. Lara's serious mental health condition despite having medical and mental health records documenting his past treatment on antipsychotic medication in the Jail. Defendants failed to provide Mr. Lara with adequate mental health services while his condition deteriorated as alleged herein.

80.     Defendant Francisco failed to perform appropriate assessments or evaluations of Mr. Lara despite having knowledge that there had been no psychiatric consultation done for Mr. Lara for the 90 days since he had entered the Jail's custody, that Mr. Lara had a history of schizophrenia and associated symptoms, that Mr. Lara had a history of requiring psychotropic medication to treat his schizophrenia, and that Mr. Lara had reported and/or Jail records documented clear signs of Mr. Lara's psychological and emotional distress and decompensation such as increased paranoia and auditory hallucinations.

81.     Defendants' actions and/or omissions as alleged herein, including but not limited to their failure to provide Mr. Lara with appropriate psychiatric assessments, care and treatment, and failure to provide appropriate language interpretation during health contacts with him, along with the acts and/or omissions of Defendants in failing to train, supervise, and/or promulgate appropriate policies and procedures to provide adequate health care and treatment, constituted deliberate indifference to Mr. Lara's serious medical needs, health, and safety.

82.     As a direct and proximate result of Defendants' conduct, Mr. Lara experienced physical pain, severe emotional distress, and mental anguish, as well as loss of his life and other damages alleged herein.

83.     The aforementioned acts of individual Defendants were conducted with conscious disregard for the safety of Plaintiff and others, and were therefore malicious, wanton, and oppressive. As a result, Defendants' actions justify an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

//
//
//
//
//

## SECOND CLAIM FOR RELIEF

**Failure to Protect from Harm in Violation of the Fourteenth and Eighth**

**Amendments to the Constitution of the United States**

**(Survival Action – 42 U.S.C. § 1983)**

**(Plaintiff Estate Against All Defendants)**

84.     Plaintiffs incorporate all of the above previous paragraphs as if fully set forth herein.

85.     Mr. Lara was a pre-trial detainee from September 1, 2019 to December 4, 2019. From December 5, 2019 to his death on December 22, 2019, Mr. Lara was in post-conviction status after entering a plea. Defendants' failure to protect him from harm as a pre-trial detainee is asserted under the Fourteenth Amendment and post-conviction is asserted under the Eighth Amendment.

86.     Defendants could have taken action to prevent unnecessary harm to Mr. Lara but refused or failed to do so. As a result, Mr. Lara suffered harm from other inmates and died a preventable death in the Jail.

87.     Defendants failed to have minimally necessary policies and procedures concerning the adequate identification and housing of Mr. Lara, whom they knew or should have known to be at risk of self-harm and vulnerable to harm from other inmates.

88.     Defendants also failed to implement minimally sufficient policies and procedures to protect Mr. Lara from harm. Defendants failed to appropriately train and supervise staff regarding identification and handling of detainees at risk of harm.

89.     Defendants failed to protect Mr. Lara by failing to provide appropriate mental health services despite having knowledge of his mental health history at the Jail. Defendants' acts and/or omissions as alleged herein, including but not limited to their failure to take appropriate measures to protect Mr. Lara from harm (self-harm as well as harm from other inmates), along with the acts and/or omissions of the Defendants in failing to train, supervise and/or promulgate appropriate policies and procedures in order

to protect Mr. Lara from harm, constituted deliberate indifference to Mr. Lara's health and safety.

90.     As a direct and proximate result of Defendants' conduct, Mr. Lara experienced physical pain, severe emotional distress, and mental anguish during his incarceration and leading up to his death.

91.     Defendants' actions were malicious, oppressive, and/or in reckless disregard of the Plaintiff's rights, thereby justifying an award to Plaintiff of exemplary or punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## THIRD CLAIM FOR RELIEF

**Deprivation of Substantive Due Process Rights in Violation of First and Fourteenth Amendments to the Constitution of the United States –Loss of Parent/Child Relationship (42 U.S.C. § 1983)**

**(Plaintiffs Patricia Ramirez, Rafael Ramirez, and Jennifer Ramirez Against all Defendants)**

92.     Plaintiffs incorporate all of the above previous paragraphs as if fully set forth herein.

93.     The aforementioned acts and/or omissions of Defendants in being deliberately indifferent to Mr. Lara's serious medical needs, health and safety, violating Mr. Lara's constitutional rights, and their failure provide care, to protect Mr. Lara from harm, and to train, supervise, and/or take other appropriate measures to prevent the acts and/or omissions that caused Mr. Lara's untimely and wrongful death deprived Plaintiffs Patricia Ramirez, Rafael Ramirez, and Jennifer Ramirez of their liberty interests in the parent-child relationship in violation of their substantive due process rights as defined by the First and Fourteenth Amendments of the Constitution.

94.     As a direct and proximate result of the aforementioned acts and/or omissions of Defendants, Plaintiffs suffered injuries and damages as alleged herein..

COMPLAINT FOR DAMAGES                    -21-

1

2

3

**FOURTH CLAIM FOR RELIEF**

**Wrongful Death – California Code Civ. Proc. § 377.60**

**(All Plaintiffs Against All Defendants)**

4    95.    Plaintiffs incorporate all of the above previous paragraphs as if fully set forth

5    herein.

6    96.    Mr. Lara's death was a direct and proximate result of the aforementioned

7    wrongful and/or negligent acts and/or omissions of Defendants. Defendants' acts and/or

8    omissions thus were also a direct and proximate cause of Plaintiffs' injuries and damages,

9    as alleged herein.

10    97.    As a direct and proximate result of Defendants' wrongful and/or negligent

11    acts and/or omissions, Plaintiffs incurred expenses for funeral and burial expenses in an

12    amount to be proved.

13    98.    As a direct and proximate result of Defendants' wrongful and/or negligent

14    acts and/or omissions, Plaintiffs suffered the loss of the services, society, care, and

15    protection of the decedent. Plaintiffs are further entitled to recover prejudgment interest.

16    99.    Plaintiff Estate of Rafael Ramirez Lara is entitled to recover punitive

17    damages against individual Defendants who, with conscious disregard of Mr. Lara's

18    rights, failed to provide him with health care services meeting the professional standard of

19    practice, and/or failed to adhere to legal and professional standards of correctional

20    supervision and administration.

21    100.    The aforementioned acts of Defendant were willful, wanton, malicious, and

22    oppressive, thereby justifying an award to Plaintiff of exemplary and punitive damages to

23    punish the wrongful conduct alleged herein and to deter such conduct in the future.

**PRAYER FOR RELIEF**

25    WHEREFORE, Plaintiffs pray for the following relief:

26    1.    For compensatory, general and special damages against each Defendant, jointly and

27    severally, in an amount to be proven at trial;

28

COMPLAINT FOR DAMAGES                           -22-

2. For damages related to loss of familial relations as to Plaintiffs Patricia Ramirez, Rafael Ramirez, and Jennifer Ramirez;

3. Funeral and burial expenses, and incidental expenses not yet fully ascertained;

4. General damages, included damages for physical and emotional pain, emotional distress, hardship, suffering, shock, worry, anxiety, sleeplessness, illness and trauma and suffering, society, care and protection of the decedent;

5. Prejudgment interest;

6. For punitive and exemplary damages against each individually named Defendant in an amount appropriate to punish Defendant(s) and deter others from engaging in similar misconduct;

7. For costs of suit and reasonable attorneys' fees and costs pursuant to 42 U.S.C § 1988, and as otherwise authorized by statute or law;

8. For restitution as the Court deems just and proper;

9. For such other relief, including injunctive and/or declaratory relief, as the Court may deem proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury in this action.


Dated: April 2, 2021                    Respectfully Submitted,
                                        RIFKIN LAW OFFICE

                                        By:  _/s/ Lori Rifkin_

                                             Lori Rifkin
                                             Sairah Budhwani

                                        Attorneys for Plaintiffs